

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| ALI SALEH KAHLAH AL-MARRI, and § <br> MARK A. BERMAN, as Next Friend, § <br>       Petitioners, § <br>  § <br> vs.  § <br>  § <br> COMMANDER C.T. HANFT,  § <br> USN Commander, Consolidated Naval Brig, § <br>       Respondent. §  | CIVIL ACTION NO. 2:04-2257-HFF-RSC |

**MEMORANDUM OPINION AND ORDER**

**I.   INTRODUCTION**

This is a 28 U.S.C. § 2241 *habeas corpus* action.  The Court has jurisdiction over the matter pursuant to 28 U.S.C. § 1331.  Pending before the Court is Petitioner Ali Saleh Kahlah al-Marri's (Petitioner)[1] motion for summary judgment as to counts one and three of his petition.[2]  The sole question before the Court today is whether the President of the United States (President) is authorized to detain a non-citizen as an enemy combatant under the unique circumstances presented here.

---

[1]Technically, there are two Petitioners in this case, one of whom is Ali Saleh Kahlah al-Marri's Next Friend.  Mr. Berman is not being held as an enemy combatant.  Thus, all references herein to "Petitioner" will be to Mr. al-Marri.

[2]In counts one and three of the petition, Petitioner claims that his detention without being criminally charged violates the United States Constitution, including the Fourth, Fifth and Sixth Amendments, as well as the *habeas* suspension clause found in Article Two.

## II.   FACTUAL AND PROCEDURAL HISTORY

The United States District Court for the Central District of Illinois succinctly stated the relevant facts of this matter in *Al-Marri v. Bush*, 274 F. Supp. 2d 1003 (C.D.Ill. 2003):

> Al-Marri is a Qatari national who legally entered the United States on September 10, 2001, with his wife and children. He had previously obtained a bachelor's degree from Bradley University in Peoria, Illinois, in the early 1990s, and was returning to the United States to obtain a master's degree from Bradley.
>
> On December 12, 2001, al-Marri was arrested by FBI agents in Peoria at the direction of the U.S. Attorney's Office for the Southern District of New York as a material witness in the investigation of the September 11, 2001, terrorist attacks. He was then transferred to New York City.
>
> Al-Marri was formally arrested on a criminal complaint charging him with credit card fraud on January 28, 2002. On February 6, 2002, he was indicted and charged with possession of 15 or more unauthorized or counterfeit access devices with intent to defraud in the United States District Court for the Southern District of New York. He pled not guilty, and the case followed the normal course of litigation. On January 22, 2003, al-Marri was charged in a second indictment with two counts of making a false statement to the FBI, three counts of making a false statement in a bank application, and one count of using a means of identification of another person for purposes of influencing the action of a federally insured financial institution. He also entered a plea of not guilty to the second indictment and succeeded in having the two indictments consolidated.
>
> Al-Marri initially waived any objection to venue in the Southern District of New York, but later withdrew his waiver after obtaining new counsel. He then moved to dismiss the indictments on grounds of improper venue. On May 12, 2003, al-Marri's motion was granted and the indictments were dismissed for improper venue. However, a new criminal complaint had been filed under seal in [the Central District of Illinois] on May 1, 2003, and al-Marri was arraigned on that complaint on May 13, 2003. He was then transferred back to Peoria, where a grand jury indicted him on the same counts that had been charged in the two indictments in the Southern District of New York. Al-Marri was arraigned and a pretrial conference was set for July 2, 2003, with a jury trial to begin on July 21, 2003.
>
> On June 23, 2003, President Bush designated al-Marri as an enemy combatant and directed that he be transferred to the control of the Defense Department for detention.[3] That same morning, the U.S. Attorney's Office moved to dismiss the

---

[3]In its answer to the petition, Respondent enumerates several bases upon which the President relied in designating al-Marri as an enemy combatant:

> Among the findings made by the President concerning petitioner are that he is "closely associated with al Qaeda;" [has] engaged in conduct that constituted hostile

2

indictment with prejudice, and the motion was granted. Al-Marri's counsel then requested that the [c]ourt stay the case to prevent any attempt to transfer him from the jurisdiction until he could file a habeas petition. However, the [c]ourt determined that as the case had been dismissed with prejudice, it lacked jurisdiction to issue any type of a stay. The [c]ourt did obtain the U.S. Attorney's agreement to inform counsel of the location to which al-Marri was to be moved, and counsel has been so advised. The U.S. Attorney also agreed to provide both the [c]ourt and al-Marri's counsel with advance notice if al-Marri was going to be moved to any location outside of the United States so that counsel could seek an emergency injunction in the appropriate court. Al-Marri was then immediately transferred into military custody and transported to the Naval Consolidated Brig in Charleston, South Carolina, where he continues to be held.

On July 8, 2003, al-Marri's counsel filed a § 2241 [p]etition on his behalf, as it is undisputed that al-Marri is unavailable to sign it for himself. In response, the Government moved to either dismiss or transfer the [p]etition to the District of South Carolina, raising essentially three arguments: (1) the [p]etition has not been properly brought on al-Marri's behalf; (2) no proper respondent with custody over al-Marri is present within this Court's territorial jurisdiction; and (3) venue over the action appropriately lies in South Carolina, where he is detained.

*Id*. at 1004-05.

The District Court for the Central District of Illinois granted the Government's motion to dismiss on the ground that the petition had been filed in an improper venue. *Id.* at 1010. The Court of Appeals for the Seventh Circuit affirmed, *Al-Marri v. Bush*, 360 F.3d 707 (7th Cir. 2004), and the Supreme Court denied Petitioner's writ of certiorari, *Al-Marri v. Rumsfeld*, 125 S.Ct. 34 (2004).

On July 8, 2004, Petitioner filed the present petition for writ of *habeas corpus*, raising five claims: 1) unlawful detention; 2) right to counsel; 3) right to be charged; 4) denial of due process;

---

and war-like acts, including conduct in preparation for acts of international terrorism with the aim to cause injury to or adverse effects on the United States; "possesses intelligence, including intelligence about personnel and activities of al Qaeda that, if communicated to the U.S., would aid U.S. efforts to prevent attacks by al Qaeda;" and "represents a continuing, present, and grave danger to the national security of the United States" whose "detention is necessary to prevent him from aiding al Qaeda in its efforts to attack the United States."

(Resp't Answer to Pet. at 20 (citing President's Order of June 23, 2003).)

and 5) unlawful interrogation. Subsequently, on March 3, 2005, Petitioner filed the present motion for summary judgment as to counts one and three.

### III.    STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The moving party bears this initial burden of informing the Court of the basis for its motions, and identifying those portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court reviews the record by drawing all inferences most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654 (1962)).

"Once the moving party carries its burden, the adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The adverse party must show more than "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. If an adverse party completely fails to make an offer of proof concerning an essential element of that party's case on which that party will bear the burden of proof, then all other facts are necessarily rendered immaterial and the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 322-23. Hence, the granting of summary judgment involves a three-tier analysis. First, the Court determines whether a genuine issue actually exists so as to necessitate a trial. FED. R. CIV. P. 56(e). An issue is genuine "if the evidence is such that a reasonable [trier of

4

fact] could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). Second, the Court must ascertain whether that genuine issue pertains to material facts. FED. R. CIV. P. 56(e). The substantial law of the case identifies the material facts, that is, those facts that potentially affect the outcome of the suit. *Anderson*, 477 U.S. at 248. Third, assuming no genuine issue exists as to the material facts, the Court will decide whether the moving party shall prevail solely as a matter of law. FED. R. CIV. P. 56(e).

Summary judgment is "properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327. The primary issue is whether the material facts present a sufficient disagreement as to require a trial, or whether the facts are sufficiently one-sided that one party should prevail as a matter of law. *Anderson*, 477 U.S. at 251-52. The substantive law of the case identifies which facts are material. *Id.* at 248. Only disputed facts potentially affecting the outcome of the suit under the substantive law preclude the entry of summary judgment.

**IV.     CONTENTIONS OF THE PARTIES**

Petitioner posits that the President possesses neither statutory nor constitutional authority to subject civilians, albeit non-citizens, to indefinite military detention as enemy combatants.

Respondent counters that both the Authorization for Use of Military Force (AUMF), Pub.L. No. 107-40, 115 Stat. 24, and the President's inherent constitutional authority allow for Petitioner's detention.

## V. DISCUSSION

### A. *Padilla v. Hanft*

Petitioner relies heavily on this Court's recent opinion in *Padilla v. Hanft*, No. 2:04-2221-26AJ, 2005 WL 465691 (D.S.C. Feb. 28, 2005), for his contention that "the critical issue is not citizenship but, rather, the specific circumstances surrounding Petitioner's seizure by the military." (Pet'r Mem. in Supp. of Summ. J. at 5.) Respondent, on the other hand, asserts that this Court "repeatedly recognized the significance of Padilla's citizenship in its decision granting him summary judgment." (Resp't Mem. in Opp'n to Summ. J. at 7.) This Court agrees with Respondent.

First, throughout the *Padilla* order, the Court is careful to note that its holding is limited to the facts of the case. *E.g.*, *Padilla*, 2005 WL 465691, at * 1 ("The sole question before the Court today is whether the President of the United States [ ] is authorized to detain an United States citizen as an enemy combatant under the unique circumstances presented here."); *Padilla*, 2005 WL 465691, at *17 (relying on the "narrow circumstances presented here"); and *Padilla*, 2005 WL 465691, at *20 (stating the holding is "limited to the facts of this case").

Next, and most importantly, unlike Petitioner, Mr. Padilla is an United States citizen. Although Petitioner would have this Court hold that the issue of whether an enemy combatant can be detained turns, not on citizenship, but on the location of his capture, the holding in *Padilla* does not support such an assumption. Of course, in distinguishing Mr. Padilla from Mr. Hamdi,[4] this Court did recognize the fact that Mr. Padilla was captured on American soil. *Padilla*, 2005 WL

---

[4]Mr. Hamdi is an United States citizen who was captured during military operations in Afghanistan and detained as an enemy combatant. The Supreme Court, in a plurality opinion, held that Mr. Hamdi was properly detained pursuant to the Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 24. *Hamdi v. Rumsfeld*, 124 S.Ct. 2633, 2635 (2004).

465691, at *6 (noting that the "cogency" of Respondent's argument that place of capture is of no consequence "eludes the Court"). Nevertheless, the holding was not limited to that fact alone, and the Court repeatedly acknowledged the importance of Mr. Padilla's citizenship to its holding. For instance, when relying on *Ex Parte Milligan*, 71 U.S (4 Wall.) 2 (1866), this Court stressed that "*Milligan*'s greatest import to the case at bar is the same as that found in *Quirin*: the detention of an United States citizen by the military is disallowed without explicit Congressional authorization." *Padilla*, 2005 WL 465691, at *9.

The Court's reliance on the Non-Detention Act, 18 U.S.C. § 4001(a), in *Padilla* further indicates the significance of Mr. Padilla's citizenship. The Non-Detention Act provides that "[n]o citizen shall be imprisoned or otherwise detained by the United States except pursuant to an Act of Congress." *Id*. In response to the Government's argument that the AUMF satisfied the Non-Detention Act's requirement for an act of Congress, this Court noted that "'[it] must assume, when asked to find implied powers in a grant of legislative or executive authority, that the law makers intended to place no greater restraint on the *citizen* than was clearly and unmistakably indicated by the language they used.'" *Padilla*, 2005 WL 465691, at *10 (quoting *Ex Parte Endo*, 323 U.S. 283, 300 (1944)) (emphasis added). In light of such precedent, this Court held that the AUMF did not authorize the detention of Mr. Padilla. *Padilla*, 2005 WL 465691, at * 9.

To continue to rely on *Padilla* in light of the distinct and crucial differences between that case and the present, Petitioner must, and does, assert that his status as a resident alien is irrelevant to the legality of his detainment. To yield to such an argument, the Court must accept the premise that aliens to this country, at all times, have access to the same constitutional protections as its citizens.

7

This it cannot do. Both Supreme Court precedent and statutory law require the failure of such a premise.

B. *Citizen Status v. Alien Status*

 1. *Johnson v. Eisentrager*

In *Johnson v. Eisentrager*, 339 U.S. 763 (1950), the Supreme Court addressed the question of whether enemy aliens outside of the United States, deprived of their liberty via the purported authority of the United States, were entitled access to the civilian courts to challenge the constitutionality of their imprisonment. *Id*. at 767. Twenty-one German nationals, in the service of the German armed forces during World War II, were convicted of "violating laws of war, by engaging in, permitting or ordering continued military activity against the United States after surrender of Germany." *Id*. at 766. In holding that *habeas corpus* protection was not afforded to these parties,[5] the Court began by measuring the differences between the status of citizens and that of aliens. The Court explained that

> [t]he alien, to whom the United States has been traditionally hospitable, has been accorded a generous and ascending scale of rights as he increases his identity with our society. Mere lawful presence in the country creates an implied assurance of safe conduct and gives him certain rights; they become more extensive and secure when he makes preliminary declaration of intention to become a citizen, and they expand to those of full citizenship upon naturalization.

*Id*. at 770. The Court also noted that

> [m]odern law has come a long way since the time when outbreak of war made every enemy national an outlaw, subject to both public and private slaughter, cruelty and plunder. But even by the most magnanimous view, our law does not abolish the

---

[5]The holding of this case was limited by *Braden v. 30th Judicial Circuit Court of Ky*, 410 U.S. 484 (1973). However, that limitation has no effect on the *Eisentrager* Court's discussion of resident enemy alien rights.

> inherent distinctions recognized throughout the civilized world between citizens and aliens, nor between aliens of friendly and of enemy allegiance . . . .

*Id*. at 769 (footnote omitted).

The central focus of *Eisentrager* is on the differences between the rights of resident aliens and non-resident aliens. However, in establishing that the extension of constitutional protections beyond citizenry requires the alien's presence within the jurisdiction, the Court limited the reach of such protections to resident aliens. The Court acknowledged that "executive power over enemy aliens, undelayed and unhampered by litigation, has been deemed throughout our history, essential to war-time security." *Id*. at 774. The Court recognized as the "'sound principle of the common law'" that a resident alien enemy's use of our courts is only limited "'as necessary to prevent use of the courts to accomplish a purpose which might hamper our own war efforts or give aid to the enemy.'" *Eisentrager*, 339 U.S. at 776 (quoting *Ex parte Kawato*, 317 U.S. 69, 75 (1942)).

   2.  *Alien Enemy Act of 1798*

Further indicia of the decreased rights of enemy aliens arises from the Alien Enemy Act of 1798, 1 Stat. 577, as amended, 50 U.S.C. § 21, *et seq.*, which has remained virtually unchanged since it was enacted. This act provides, in relevant part, that

> [w]henever there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government, and the President makes public proclamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government, being of the age of fourteen years and upward, who shall be within the United States and not actually naturalized, shall be liable to be apprehended, restrained, secured, and removed as alien enemies.

*Id*.

The constitutionality of this act was upheld in *Ludecke v. Watkins*, 335 U.S. 160, 173 (1948), in which the Court stated,

> [h]e who was entrusted with such vast powers in relation to the outside world was also entrusted by Congress, almost throughout the whole life of this nation, with the disposition of alien enemies during a state of war. Such a page in history is worth more than a volume of rhetoric."

*Id*.

That the Alien Enemy Act does not have direct application to this case is simply a result of the nature of the war on terrorism, which is not a "declared war" against a "foreign nation or government." Nevertheless, the AEA has the significance of establishing that the authority to detain enemy aliens in times of war is not a novel concept to the executive branch of our government.[6]

History has established that differences do, indeed, exist between the protections afforded citizens and resident enemy aliens, especially during times of war. Necessarily, the President's war powers must be sufficient to adequately address national security and foreign policy concerns. The Supreme Court has observed that

> "(A)ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference."

*Matthews v. Diaz*, 426 U.S. 67, 81 n.17 (1976) (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580,

---

[6] The proposition that citizens and non-citizens possess different degrees of constitutional rights has been established in other areas of the law as well. For example, in *Matthews v. Diaz*, 426 U.S. 67, 79-80 (1976), the Court explained that "[i]n the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens."

10

588-89 (1952)). Against this backdrop, the Court turns to whether the AUMF authorizes the President's detention of Petitioner.

### C. *Authorization for Use of Military Force*

The AUMF provides, in relevant part, that

> [t]he President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons."

Pub. L. No. 107-40, 115 Stat. 24.

Although Petitioner in the present case was not captured on the battlefield in Afghanistan as was Mr. Hamdi, the Supreme Court's opinion that the AUMF served as congressional authorization for his detention is applicable here. In holding that Mr. Hamdi's detention was "necessary and appropriate . . . to prevent any future acts of international terrorism against the United States," AUMF, Pub. L. No. 107-40, 115 Stat. 24, the plurality noted,

> The capture and detention of lawful combatants and the capture, detention, and trial of unlawful combatants, by "universal agreement and practice," are "important incident[s] of war." *Ex parte Quirin*, 317 U.S., at 28, 63 S.Ct. 2. The purpose of detention is to prevent captured individuals from returning to the field of battle and taking up arms once again. Naqvi, Doubtful Prisoner-of-War Status, 84 Int'l Rev. Red Cross 571, 572 (2002) ("[C]aptivity in war is 'neither revenge, nor punishment, but solely protective custody, the only purpose of which is to prevent the prisoners of war from further participation in the war'") (quoting decision of Nuremberg Military Tribunal, reprinted in 41 Am. J. Int'l L. 172, 229 (1947)); W. Winthrop, Military Law and Precedents 788 (rev.2d ed. 1920) ("The time has long passed when 'no quarter' was the rule on the battlefield . . . . It is now recognized that 'Captivity is neither a punishment nor an act of vengeance,' but 'merely a temporary detention which is devoid of all penal character. . . . A prisoner of war is no convict; his imprisonment is a simple war measure.'" (citations omitted)); cf. *In re Territo*, 156 F.2d 142, 145 (9th Cir. 1946) ("The object of capture is to prevent the captured individual from serving the enemy. He is disarmed and from then on must be removed as completely as practicable from the front, treated humanely, and in time exchanged, repatriated, or otherwise released." (footnotes omitted)).

*Hamdi*, 124 S.Ct. at 2640.

As Respondent recognizes, "aliens who come to the United States to support al Qaeda terror operations . . . are in the same position as the September 11th hijackers when the hijackers arrived in the United States. . . . [T]he AUMF emphasizes that the individuals and groups responsible for the 'acts of treacherous violence' that were committed on September 11, 2001, 'continue to pose an unusual and extraordinary threat to the national security and foreign policy of the United States.'" (Resp't Mem. In Opp'n of Summ. J. at 14 (quoting AUMF, Pub. L. No. 107-40, 115 Stat. 24).) Assuming for purposes of this motion only that all the facts asserted by Respondent are true, Petitioner attended an al Qaeda terror training camp and later, on September 10, 2001, entered this country to continue the battle that the September 11th hijackers began on American soil.[7]

The AUMF was enacted to allow the President to "use all necessary and appropriate force" to "protect United States citizens both at home and abroad." AUMF, Pub. L. No. 107-40, 115 Stat. 24. This Court agrees with Respondent that "[b]ecause the AUMF was enacted in direct response to the September 11th attacks, Congress [ ] intended the scope of the AUMF to reach alien al Qaeda operatives who enter this country to commit hostile and war-like acts. (Resp't Mem. in Opp'n to Summ. J. at 15.) Accordingly, this Court holds that Petitioner's detention is proper pursuant to the AUMF and, thus, declines to reach the issue of whether the President possesses inherent authority to detain Petitioner.

---

[7]It is important to note that Petitioner has been labeled by the President an enemy combatant, not because he is a Qatari citizen, but because of his alleged association with al-Qaeda terrorist activities.

D.     Other Concerns

1.     *Petitioner's Criminal Charges*

Petitioner makes much of the fact that he was designated as an enemy combatant sixteen months after he was indicted on criminal charges. According to Petitioner, his detention as an enemy combatant was not necessary to thwart any war-like acts he may commit since he was already being held on criminal charges. However, Respondent maintains that the facts that led the President to designate Petitioner as an enemy combatant were developed while he was in custody on the pending criminal charges. Once that determination was made, Petitioner fell within military jurisdiction.

Such a situation can be likened to charges pending in state court: if, during the pendency of and investigation into the state charges, it is revealed that the defendant's actions implicate federal charges, the state charges can be dismissed and the matter can be transferred to federal jurisdiction. It is unreasonable to think that federal charges cannot be brought against an individual simply because he is being held on pending state charges. The argument that Petitioner's criminal charges necessarily preclude military jurisdiction is equally unsatisfactory.

Petitioner's argument also fails because the purpose of detaining enemy combatants is not only to thwart any ongoing activities of terrorism, but, as stated above, to preclude the detainee from returning to those activities. *Hamdi*, 124 S.Ct. at 2640. It is certainly possible that Petitioner could have been acquitted of the criminal charges against him, thus allowing him to, as Respondent maintains, return to the service of the enemy.[8] Accordingly, this Court declines to find that

---

[8]This Court recognizes the natural response to this reasoning that, when a defendant is acquitted of criminal charges, society should not assume that he ever did nor that he will, in the future, engage in the activities for which he was charged. In this case, however, Petitioner was not charged with crimes of terrorism, and thus, an acquittal of various fraud charges does not lead to the conclusion that he will not, in the future, engage in acts of terrorism as alleged by the government.

Petitioner's criminal charges prevent his present detainment as an enemy combatant.

This Court stated in *Padilla* that "[t]here can be no debate that this country's laws amply provide for the investigation, detention and prosecution of citizen and non-citizen terrorists alike." *Padilla*, 2005 WL 465691, at *12. Within that statement, however, is no implication that other options are unavailable to the Government when detaining non-citizens. In fact, the cited portion of Justice Scalia's dissent in *Hamdi* is prefaced with the assertion that "citizens have been charged and tried in Article III courts for acts of war against the United States even when their noncitizen co-conspirators were not." *Hamdi*, 124 S.Ct. at 2664 (Scalia, J., dissenting) (citing *United States v. Fricke*, 259 F. 673 (S.D.N.Y. 1919); *United States v. Robinson*, 259 F. 685 (S.D.N.Y. 1919); *United States ex rel. Wessels v. McDonald*, 265 F. 754 (E.D.N.Y.1920); *Ex parte Quirin*, 317 U.S. 1 (1942)). Thus, this Court's statement in *Padilla* does not foreclose Petitioner's detention.

    2.    *Fact-finding Process*

Of course, today's ruling does not close the door of this Court to Petitioner. As stated above, this ruling is based upon the assumption that all the facts asserted by Respondent are true. It does not foreclose Petitioner's opportunity to challenge those facts. "For more than a century the central meaning of procedural due process has been clear: '[p]arties whose rights are to be affected are entitled to be heard.'" *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) (quoting *Baldwin v. Hale*, 1 Wall. 223, 233 (1864).

The plurality in *Hamdi* leaves to the district courts the determination of the manner in which such due process proceedings must occur, stating

> [w]e anticipate that a District Court [will] proceed with the caution that we have indicated is necessary in this setting, engaging in a factfinding process that is both prudent and incremental. We have no reason to doubt that courts faced with these

>sensitive matters will pay proper heed both to the matters of national security that might arise in an individual case and to the constitutional limitations safeguarding essential liberties that remain vibrant even in times of security concerns.

*Hamdi*, 124 S.Ct. at 2652.  This Court leaves that determination for another day.

## VI. CONCLUSION

In light of the foregoing discussion and analysis, it is the judgment of this Court that Petitioner's motion for summary judgment on counts one and three of his petition must be **DENIED**.

**IT IS SO ORDERED**.

Signed this 8th day of July, 2005, in Spartanburg, South Carolina.

s/ Henry F. Floyd
HENRY F. FLOYD
UNITED STATES DISTRICT JUDGE
