

RECEIVED
USDC CLERK, CHARLESTON, SC

2006 MAY -8 P 3: 43

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| ALI SALEH KAHLAH AL-MARRI, and MARK A. BERMAN, as next friend, Petitioners, vs. COMMANDER C.T. HANFT, USN Commander, Consolidated Naval Brig, Respondent. | § § § § § C. A. NO. 2:04-2257-HFF-RSC § § § § § § |

## REPORT AND RECOMMENDATION

### I.  INTRODUCTION

Pending before the Court is the petition of Ali Saleh Kahlah al-Marri's (al-Marri or Petitioner)[1] in accord with 28 U.S.C. § 2241 for *habeas corpus* relief.  Petitioner is a Qatari and Saudi national who entered the United States legally and been declared an enemy combatant by the President of the United States.  He is detained in the Naval Consolidated Brig near Charleston, South Carolina.  This Court has jurisdiction over the matter pursuant to 28 U.S.C. § 1331.

---

[1] Technically, there are two Petitioners in this case, one of whom is Mark A. Berman, al-Marri's Next Friend.  He is not being held as an enemy combatant.  Thus, all references herein to "Petitioner" will be to Mr. al-Marri.

On July 8, 2004, Petitioner filed the present petition for writ of *habeas corpus* (Docket Number 1), raising five claims: 1) unlawful detention; 2) right to counsel; 3) right to be charged; 4) denial of due process; and 5) unlawful interrogation.[2] The Respondents filed an Answer (Docket Number 11) as a Return to the Petition on September 9, 2004, and attached to the Return the President's Order declaring Petitioner an enemy combatant (Exhibit A), an unclassified declaration of Mr. Jeffrey N. Rapp, Director, Joint Intelligence Task force for Combating Terrorism (Exhibit B), and a classified secret declaration of Mr. Rapp (Exhibit C). (Collectively with the subsequently unclassified Rapp declaration referred to as "Executive Branch Declaration").

Subsequently, the Honorable Henry F. Floyd, United States District Judge, issued an Order on July 8, 2005 (Docket Number 30), denying and dismissing the petitioner's third ground for relief which essentially was a challenge to the power of the President of the United States to subject civilians, albeit non-citizens, to indefinite military detention as enemy combatants. Judge Floyd's Order fully outlines the procedural history leading up to the filing of this petition. Subsequently the matter was remanded to

---

[2] The claims of right to counsel and unlawful interrogation are not cognizable in this *habeas corpus* petition. 28 U.S.C. § 2241. In fact those claims were recently settled in the petitioner's civil rights case in this court. Al-Marri v. Rumsfeld, C. A. No. 2:05-2259-HFF-RSC. (See Complaint ¶¶ 65-67 and 68-73).

2

the undersigned for consideration of *habeas corpus* relief.

Briefing was had as to the appropriate due process procedures, and Petitioner subsequently was ordered to respond to the Executive Branch Declaration. Thereafter Petitioner indicated an inability to respond because he was not permitted to see the classified declaration. Therefore Respondent was directed to revisit the classification of the declaration and was advised that the undersigned would not consider, at this preliminary stage, information which was not presented to Petitioner.

On April 5, 2006, Respondent filed a reply essentially declassifying[3] the secret declaration of Mr. Rapp (Exhibit C). Counsel was afforded an opportunity to discuss the unclassified declaration with Petitioner and on May 5, 2006, Petitioner filed a reply to the declaration.

## II. STANDARD OF REVIEW

The procedures to be applied in considering a petition by an enemy combatant are unsettled, and the United States Supreme Court in Hamdi v. Rumsfeld, 542 U.S. 507, 124 S.Ct. 2633 (2004), counseled,

> In the absence of such process, however, a court that receives a petition for a writ of habeas corpus from an alleged enemy combatant must itself ensure that the minimum requirements of due process are achieved. Both courts below recognized as much,

---

[3] The only portions of the affidavit remaining classified are parts of paragraph 21 and paragraphs 22, 23 and 24 of the 35 paragraph declaration.

3

> focusing their energies on the question of whether Hamdi was due an opportunity to rebut the Government's case against him. The Government, too, proceeded on this assumption, presenting its affidavit and then seeking that it be evaluated under a deferential standard of review based on burdens that it alleged would accompany any greater process. As we have discussed, a habeas court in a case such as this may accept affidavit evidence like that contained in the Mobbs Declaration, so long as it also permits the alleged combatant to present his own factual case to rebut the Government's return. We anticipate that a District Court would proceed with the caution that we have indicated is necessary in this setting, engaging in a factfinding process that is both prudent and incremental.

542 U.S. at 538-5399, 124 S.Ct. at 2651-2652.

After considering the briefs of the parties on the issue of the appropriate due process procedures, the court entered an order (Docket Number 41) providing that the due process procedures applicable would be as follows:

> **The burden of proof at all times remains on the government to show by clear and convincing evidence that the petitioner is an enemy combatant;** that is presents an identified and articulable threat to this country or possesses information important to the war on terror. That burden may be met incrementally. First the Government may meet its initial burden by the presentation of credible evidence, such as the Mobbs Affidavit in the Hamdi case, that the petitioner meets the enemy combatant criteria.
> After the presentation of such credible evidence by the government, the petitioner must rebut that evidence with more persuasive evidence that he falls outside the criteria. The purpose being to address the "risk of erroneous deprivation."
> If the petitioner is unable to produce such evidence, the inquiry ends there.
> If the petitioner is able adequately to rebut

4

the government's initial showing, the decision of the Executive is entitled to less deference, and the petitioner must be released unless the government proceeds to a full-blown adversary hearing before a neutral decisionmaker. That adversarial hearing must be accompanied by greater procedural and evidentiary safeguards. At that adversarial hearing, the government must make a showing by clear and convincing evidence that the petitioner represents a continuing, present and grave danger to the national security of the United States and whose detention is necessary to prevent him from aiding al Qaeda in its efforts to attack the United States. (i.e. a showing that the petitioner was engaged in conduct in preparation for acts of international terrorism with the aim to cause injury to or adverse effects on the United States, or possesses intelligence, including intelligence about personnel and activities of al Qaeda, that if communicated to the United States would aid efforts to prevent attacks by al Qaeda.)

    That is not to say, however, that the full panoply of procedures applicable to a trial should apply. For example, the Supreme Court has indicated that hearsay may be admissible, <u>Hamdi</u> at 2649, objections that evidence was obtained unlawfully under general criminal law or the Federal Rules of Evidence would be inappropriate to evidence gathered on the battle field, but might lie as to evidence obtained in the course of the domestic war on terror. Wide ranging discovery under the Federal Rules of Civil Procedure is ill-suited to an inquiry into matters concerning national security or occurring in zones of combat half-a-world away, but might lie in a more narrow sphere to less sensitive domestic matters.

    After all the purpose of the due process hearing is to assure that the petitioner receive notice of the factual basis for his classification and a fair opportunity to rebut the government's factual assertions before a neutral decision maker.

Order filed December 19, 2005 (Docket Number 41).

Thus the standard of review at this level is limited to determining which is more persuasive on the issue of whether the petitioner falls outside the enemy combatant criteria, the government's credible evidence or the responsive rebuttal evidence which the petitioner wishes to present. The purpose being to address the "risk of erroneous deprivation." Hamdi v. Rumsfeld, 542 U.S. 507, 124 S.Ct. 2633 at 2649 (2004), (quoting Mathews v. Eldridge, 424 U.S. 319 at 335 (1976)). The procedure is not dissimilar to the incremental procedure applied to habeas corpus proceedings under the Rules Governing Habeas Corpus under 28 U.S.C. § 2255, and this stage is similar to the review directed under Rule 4(b) of the Rules Governing § 2255 proceedings, "[t]he Judge who receives the motion must promptly examine it. If it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion."

### III. Executive Branch Declaration

The Executive Branch Declaration makes the following assertions as relevant here:

A.  Al-Marri trained at Bin Laden's Afghanistan terrorist training camp for 15-19 months between approximately 1996 and 1998. Training typically involved training in use of poisons, among other things.

B.  In the summer of 2001 al-Marri was introduced by Khalid Shaykh Muhammed, September 11th mastermind, to Usamu Bin Laden, and al-Marri offered to be an al Qaeda martyr or do anything else al Qaeda requested.  He was directed to enter the United States as a "sleeper agent," and to explore computer hacking methods to disrupt bank records and the U.S. financial system.  Through this relationship al-Marri began receiving assistance from Mustafa Ahmed Al-Hawsawi, an al Qaeda financier who maintained contact with and provided logistical support and funds for the September 11th hijackers.

C.  Mustafa Ahmed Al-Hawsawi met al-Marri in Dubai in August 2001 and provided him $10,000 to $13,000 and $3000 to purchase a laptop computer.  These funds were authorized by Khalid Shaykh Muhammed.

D.  Al-Marri moved his family to the United States in September 2001 ostensibly to begin studies towards a graduate degree in computer sciences at Bradley University in the Fall of 2001, but by December 2001 he rarely attended classes and was in a failing status.  Al-Marri previously obtained a bachelor's degree in business administration from Bradley University in 1991.

E.  Analysis of al-Marri's laptop computer revealed research regarding use of chemical weapons of mass destruction including bookmarks relating to the purchase of chemicals such as potassium cyanide, sodium cyanide, sulfuric acid, and arsenic.  Other

7

information found on al-Marri's computer included references to instructions for making hydrogen cyanide, cyanide poisoning and antidotes, listings of chemical concentrations "Immediately Dangerous to Life and Health," "Toxicity Profiles: Cyanides," and other technical information concerning doses and lethal effects of various cyanides. Additional sites referenced on the computer involved computer hacking, computer identity masking, and the purchase and sale of credit card numbers.

F. Computer examination also revealed files concerning jihad, martyrdom, Arabic lectures by Bin Laden, and bookmarks to jihad and Taliban related websites, photographs of the September 11th terrorist attack on the World Trade Center and Arab prisoners of war held in Afghanistan, a map of Afghanistan and an animated cartoon of an airplane flying into the World Trade Center.

G. Further examination of al-Marri's computer revealed over 1000 apparent credit card numbers stored in various computer files. Examination of credit card numbers led to the discovery of fraudulent charges to a business apparently established by al-Marri under an alias in Macomb, Illinois.

H. Examination of the inside of al-Marri's computer carrying case revealed a listing of approximately thirty-six credit card account numbers with names of the holders, expiration dates and designation of Mastercard or Visa. Al-Marri was not listed as an account holder for any card. Approximately one-half of the credit

cards were issued by domestic banks to persons other than al-Marri and were either valid numbers or had been valid numbers.

I. Yahoo E-mail accounts admittedly belonging to al-Marri were created on a network operated by Western Illinois University in Macomb, Illinois, and three of the E-mail accounts contained draft E-mail messages to an E-mail account associated with Khalid Shaykh Muhammed. The messages were reporting on his enrollment in school and a telephone number at which al-Marri purportedly could be reached. The telephone number, however, included a North Dakota area code and was not subscribed to by al-Marri. The number is alleged to be a coded version of al-Marri's cell phone number.

J. Calling cards attributed to al-Marri were used in attempts to contact the United Arab Emirates telephone number of Mustafa Ahmed Al-Hawsawi. The calling cards were used from al-Marri's cell phone, his home phone, and pay telephones in Chicago, Peoria and Springfield, Illinois.

### IV. Al-Marri Petition

In the Petition before this court, al-Marri asserts as relevant here:

A. Al-Marri and his family lawfully entered the United States on September 10, 2001, for the purpose of his obtaining a master's degree from Bradley University, the same institution from which he had earned a bachelor's degree in 1991.

B. Al-Marri was arrested in December 2001 and was charged with possession of 15 or more unauthorized or counterfeit credit card numbers, with intent to defraud, and making false statements to the FBI, making false statements in a bank application, and using a means of identification of another person for the purpose of influencing the action of a federally insured financial institution. He pled not guilty to all of these charges. The charges were subsequently dismissed on venue grounds, and al-Marri was re-indicted on the same charges in a proper jurisdiction. Al-Marri again pled not guilty.

C. On June 23, 2003, while a motion to suppress was pending in the criminal case, the indictments were dismissed in favor of the designation of al-Marri as an enemy combatant by the President of the United States.

D. Al-Marri asserts he is a civilian and not a combatant.

**V. Al-Marri Reply**

In his reply to the Executive Branch Declaration, al-Marri asserts as relevant here:

A. He is a civilian who came to the United States lawfully to pursue a graduate degree at Bradley University.

B. He denies he came to the United States as an al Qaeda "sleeper agent" or he was otherwise a member of, or affiliated with, al Qaeda.

C. He generally denies the allegations contained in the Rapp declaration as well his designation as an "enemy combatant."

D. He denies he entered the United States to commit "hostile or war-like acts," including acts of terrorism, or he is otherwise a member of, or affiliated with, al Qaeda.

## VI. DISCUSSION

It plainly appears from the pleadings, the attached exhibits, and the various declarations that the moving party is not entitled to relief, and the petition must be dismissed.

As noted the issue here is which is more persuasive on the issue of whether the petitioner falls outside the enemy combatant criteria, the government's credible evidence or the responsive rebuttal evidence which the petitioner wishes to present, with special attention to the "risk of erroneous deprivation." Here the petitioner presents nothing but a general denial to the Executive's assertion of facts. Although he apparently has evidence he believes relevant, he refuses to present it before this court stating, "Petitioner respectfully declines *at this time* the Court's invitation to assume the burden of proving his own innocence, a burden that is unconstitutional, unlawful and un-American." Petitioner's Response filed May 4, 2006 (Docket Number 68)(emphasis added).

The petitioner mistakes an order of this court for an invitation. He also forgets his status as the petitioner in a

11

civil proceeding under 28 U.S.C. § 2241 which he is obligated to prosecute. This failure to prosecute alone would justify dismissal of his petition. <u>Davis v. Williams</u>, 588 F.2d 69, 70 (4th Cir. 1978).

Al-Marri brought this action and has now refused to participate in a meaningful way. As a result, there is nothing specific before the court to dispute even the simplest of assertions which al-Marri could easily dispute, were they not accurate. For example:

A. Al-Marri presents no information concerning the source of his financial support while studying in this country to counter the government's assertion that Mustafa Ahmed Al-Hawsawi met al-Marri in Dubai in August 2001 and provided him $10,000 to $13,000 and $3000 to purchase a laptop computer and that these funds were authorized by Khalid Shaykh Muhammed.

B. Al-Marri presents no information concerning his graduate studies and does not dispute or offer easily obtainable evidence to counter the assertion that by December 2001 he had rarely attended classes and was in a failing status despite having moved his family to the United States in September 2001 ostensibly for the purposes of pursuing an education.

C. Al-Marri does not deny or offer any explanation for why his laptop computer contained research regarding use of chemical weapons of mass destruction including bookmarks relating to the

12

sulfuric acid, and arsenic. Nor does he deny or dispute that information found on his computer included references to instructions for making hydrogen cyanide, cyanide poisoning and antidotes, listings of chemical concentrations "Immediately Dangerous to Life and Health," "Toxicity Profiles: Cyanides," and other technical information concerning doses and lethal effects of various cyanides. Likewise there is no denial that sites referenced on the computer involved computer hacking, computer identity masking and the purchase and sale of credit card numbers.

    D.  Al-Marri does not deny or offer any explanation for why his laptop computer contained files concerning jihad, martyrdom, Arabic lectures by Bin Laden, and bookmarks to jihad and Taliban related websites, photographs of the September 11th terrorist attack on the World Trade Center and Arab prisoners of war held in Afghanistan, a map of Afghanistan and an animated cartoon of an airplane flying into the World Trade Center.

    E.  Al-Marri does not deny or offer explanation for why his computer and computer carrying case included over a thousand credit card numbers and information which were not his. No denial is made concerning allegations of fraudulent business transactions, or a business apparently established by him. Nor does he provide any information explaining or denying his association with a telephone credit card being used in attempts to contact the United Arab Emirates telephone number of Mustafa Ahmed Al-Hawsawi.

F. Al-Marri does not attempt to explain the Yahoo E-mail accounts admittedly belonging to al-Marri which were created on a network operated by Western Illinois University in Macomb, Illinois, and which included draft E-mail messages to an E-mail account associated with Khalid Shaykh Muhammed relating information concerning his well being and contact numbers.

At the very least these un-rebutted facts demonstrate the lack of any effort on the part of the petitioner to establish the falsity of the Executive Branch Declaration, to demonstrate the possibility of an erroneous deprivation, or otherwise meet his burden of persuasion.

As the United States Supreme Court has indicated the issue at this stage is one of determining which presentation is more persuasive, the Executive Branch Declaration or Petitioner's claims and rebuttals; the Executive Branch Declarations overwhelmingly prevail.

In deciding which is more persuasive, the undersigned has not considered such things as the number of declarations for one party or the other, or for that matter given weight based upon the source of the declarations or pleadings. Nor has greater weight been given to one pleading or the other based upon credibility since none of the declarations were sworn to, hearsay predominated and none carried any other independent indicia of truthfulness. The court did consider the extent to which the parties provided details

14

within their capacity to provide them, how specific the assertions or denials were, how direct the responses were to the issues in this matter, and the extent to which a factual assertion tends to establish falsity in a pleading or points to the possibility of an erroneous deprivation.

In <u>Hamdi</u> Justice O'Connor wrote,

> We therefore hold that a citizen-detainee seeking to challenge his classification as an enemy combatant must receive notice of the factual basis for his classification, and a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker. See <u>Cleveland Bd. of Ed. v. Loudermill</u>, 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) ("An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case'") (quoting <u>Mullane v. Central Hanover Bank & Trust Co.</u>, 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950)); <u>Concrete Pipe & Products of Cal., Inc. v. Construction Laborers Pension Trust for Southern Cal.</u>, 508 U.S. 602, 617, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993) ("due process requires a 'neutral and detached judge in the first instance'") (quoting <u>Ward v. Monroeville</u>, 409 U.S. 57, 61-62, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972)). "For more than a century the central meaning of procedural due process has been clear: 'Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.' It is equally fundamental that the right to notice and an opportunity to be heard 'must be granted at a meaningful time and in a meaningful manner.'" <u>Fuentes v. Shevin</u>, 407 U.S. 67, 80, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) (quoting <u>Baldwin v. Hale</u>, 1 Wall. 223, 233, 17 L.Ed. 531 (1864); <u>Armstrong v. Manzo</u>, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965) (other citations omitted)).

542 U.S. at 533.

The petitioner here has been given notice and opportunity, but has responded with merely a general denial and an election not to further participate in these proceedings.

Neither due process nor the rule of law in general grant a party the right to participate only in the court procedures he deems best or to present his proof whenever it suits him. The petitioner's refusal to follow "at this time" the orders of the court establishing fact-finding procedures that are intended to be both prudent and incremental is either a sophomoric approach to a serious issue, or worse, an attempt to subvert the judicial process and flout due process. The petitioner has squandered his opportunity to be heard by purposely not participating in a meaningful way.

**VII. CONCLUSION**

Accordingly, while recognizing the importance of respecting the acts of the Executive Branch in times of national emergency, and after providing the petitioner a threshold opportunity reasonable under the circumstances to contest the Executive Branch's actions and factual assertions in an incremental and deliberate manner, it appears to the court that the Executive Declaration is more persuasive than Petitioner's general denial on the issue of whether the petitioner meets the enemy combatant criteria, and there is no basis for concluding that an erroneous deprivation has occurred.

Therefore it is recommended that the petition for *habeas corpus* relief herein be dismissed without further action.

Respectfully Submitted,

Robert S. Carr  
United States Magistrate Judge

Charleston, South Carolina

May 8, 2006